Wilson & Fields v. Commissioner.
Wilson & Fields v. Commissioner
Docket No. 89828.
United States Tax Court
T.C. Memo 1962-200; 1962 Tax Ct. Memo LEXIS 108; 21 T.C.M. (CCH) 1080; T.C.M. (RIA) 62200; August 21, 1962
*108 Petitioner acquired real property for the purpose of developing a rental project. When financing could not be obtained, petitioner sold the property as a unit for development and sale of individual lots by the purchaser. Held, the property was not "held" by petitioner primarily for sale to customers in the ordinary course of a trade or business, and the proceeds were properly reported as capital gains. Held further, petitioner properly used the installment method of reporting the proceeds, where petitioner received cash equalling less than 30 percent of the sale price in the year of sale plus preferred stock evidencing the indebtedness of the purchaser and securing that indebtedness. Held further, additions to reserve for bad debts in fiscal 1955 to be computed in accordance with opinion. Robert V. Fullerton, Esq., 472 N. Arrowhead Ave., San Bernardino, Calif., for the petitioner. Douglas W. Argue, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined a deficiency in income taxes of the petitioner for the fiscal year ended August 31, 1955, in the amount of $19,764.33. The issues for our determination are (1) whether the proceeds *109 from petitioner's sale of real property in fiscal 1955 were properly reported as capital gains from the sale of property not held primarily for sale to customer in the ordinary course of a trade or business; (2) whether petitioner properly reported the proceeds of the sale on the installment basis; and (3) whether petitioner's additions to a reserve for bad debts in the fiscal year 1955 were reasonable in amount. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and the exhibits are incorporated herein by this reference. Wilson & Fields, the petitioner herein, is a California corporation with its principal place of business in San Bernardino, California. It filed an income tax return for the fiscal year ending August 31, 1955, on an accrual basis with the district director of internal revenue at Los Angeles. Petitioner was organized as a California corporation on April 10, 1948, to engage in, among other activities, the general contracting business, the retail furniture business, the construction and sale of homes, the subdivision development and sale of real property, and the construction, holding, and rental of residential property. It has engaged *110 in all of these activities. Petitioner's president and only stockholder, Gordon Fields, hereinafter sometimes referred to as Fields, was a co-founder of the business and, in 1949, became its sole owner. He has been in the contracting and real estate businesses and has held a California real estate broker's license since 1943. Petitioner has subdivided an average of two or three tracts a year. Generally, petitioner engaged in the construction of houses for speculative sale, but on occasion did custom building for the purchaser of a single lot. Houses built by petitioner usually sold in the price range of $8,500 to $13,500. Values of these houses had risen to a range of about $12,000 to $22,000 by the time of trial. In a joint venture with Colton Homes, a corporation, petitioner constructed three-bedroom "block" homes under franchise to sell for about $10,000. In subdividing real property for use in its speculative house-building business, petitioner utilized the services of specialists, such as engineers, architects, decorators, sales personnel, and a title company. Petitioner had occasion in its business to make application to such agencies as the Federal Housing Agency (FHA), the *111 county flood control disrrict, the local planning commission, and the State of California Division of Real Estate. For this last agency, letters showing flood control, available water, soil analysis, and prospective off-site improvements were required. Petitioner developed and operates one subdivision rental project consisting of 17 lots on which it constructed duplex, triplex, and quadruplex units. This so-called 18th Street project was developed prior to 1953, and was financed through the Santa Fe Federal Savings and Loan Association. On January 22, 1953, and February 11, 1953, by two separate conveyances, petitioner acquired title to approximately 20 acres of unimproved real estate located several miles from the city limits of San Bernardino on the south side of Highland Avenue. The deeds were recorded in March of 1953. The land was almost adjacent to Patton Hospital, a state insane asylum, and was a mile or two from other property owned by petitioner. This latter property was a subdivision called Highland Park. At the time petitioner acquired the 20 acres the hospital employed 400 to 500 persons. An expansion program was in progress, which it was anticipated would bring hundreds *112 of new employees to the area. The hospital employees constituted a low-income group and had found it difficult to acquire housing. When petitioner bought the land, subsequently designated subdivision tract No. 3996, the area in which the property was located was classified for zoning purposes as "A-1." An A-1 designation was a kind of agricultural zoning, permitting a one-family dwelling per acre with a minimum parcel size of one acre. Petitioner's books reflected purchase of the property in an entry showing land purchased for investment purposes. Due to the expansion plan for the nearby state hospital and the lack of suitable housing facilities in the vicinity, it was Fields' idea that the tract could be profitably developed for multiple dwelling home sites or for individual frame and stucco houses for rental to the hospital employees. His thinking included the possibility of housing sales to hospital personnel. No construction plans were formulated, nor were any prospective rental charges considered. About the time the property was acquired, Santa Fe Federal Savings and Loan Association, which had financed petitioner's only other rental project, was contacted by Fields with regard *113 to financing a rental project on the tract here involved. No written loan application was made. At the time, the vacancy factor in petitioner's other rental units was about 50 percent. The lending institution refused to finance the rental development project proposed for the property. No other attempts were made to secure financing therefor. All ideas for the rental or sale of houses to be constructed by petitioner on the tract were abandoned, and petitioner decided to dispose of the property as a single suit. Petitioner did not proceed with a low-cost housing project because of Fields' interest in establishing and maintaining a reputation in the area as a builder of quality homes. Except to the extent that it could be developed for housing, the property was valueless except as pasture. Petitioner did not list the lots for sale; never employed a broker or salesman to sell lots; never posted signs on the property listing lots for sale; and did not improve the property in any way or put in curbs or streets or utility lines, or otherwise perform any act physically affecting the land. However, a sign advertising the entire tract for sale probably was placed on the property. In order to *114 sell acreage in the area involved, which has a potential use for low-cost housing, it is essential to be able to represent to a prospective buyer that the site has been approved by FHA, the California Division of Real Estate, flood control agencies, and to be able to certify, as well, that water is available. On or about April 29, 1953, petitioner filed a subdivision map dated April 13, 1953, and posted a bond in the amount of $650 with the clerk of San Bernardino County, wherein the tract here involved was designated as No. 3996, a subdivision in San Bernardino County. Preparation of such a subdivision map required at that time about 90 days. The acreage was divided into 93 lots. By corporate acknowledgment dated April 13, 1953, all streets, alleys and drainage easements were dedicated to the County of San Bernardino for public use by the petitioner. An engineer's certificate on the face of the map indicated that the property was surveyed for subdivision map approval purposes in February 1953. Prior to its filing, the map was approved and accepted by the County of San Bernardino flood control district, the County auditor, the board of supervisors, the County surveyor, the division *115 of highways, the State of California, and the city engineer for San Bernardino. On May 8, 1953, petitioner filed a declaration of restrictions on tract 3996. Article 3 of the declaration designated lots 1 and 93 as business or commercial lots. It further provided that lots 2 to 92 were to be used for the construction of single-family residences only. FHA would not approve the site in the absence of recorded restrictions. On or about June 4, 1953, petitioner, as owner, filed a document entitled "Combined Notice of Intention to Sell or Lease and Subidivision Questionnaire," dated May 12, 1953, for tract 3996 with the Division of Real Estate, State of California. In this document tract 3996 was described as residential subdivision with two business lots. The number of parcels (lots) listed was 93. In section 9, entitled "True statement of terms and conditions on which it is intended to dispose of parcels" the petitioner represented that it was going to "subdivide, Improve, Build and Sell parcels separately." In the same section the petitioner answered "No" to the question, "Do you intend to sell five or more lots to any one person, rather than market individual lots to the public?" Gordon *116 Fields, "Realtor," was listed as the sales agent for the tract. In other sections of the questionnaire petitioner was required to, and did, submit information on topography; drainage; water supply; fire protection; availability of public utilities, including electricity, gas, and telephone; sanitation; streets and roads in the area; and availability of public transportation. In a notarized affidavit made a part of the combined notice and questionnaire, Gordon Fields, as president of petitioner, executed a sworn statement attesting that the statements and representations set forth in the body of the questionnaire were true and complete. On April 1, 1954, Fields, in his individual name as sponsor, filed an application for subdivision analysis of tract 3996 with FHA. The application named the subdivision Highland Park #2; listed the area of subdivision as 22 acres; assigned an unimproved value of $2,000 per acre to the property; and represented a typical lot value with utilities and street improvements as $1,200. In a section entitled "Building Program," one-family dwellings in the $9,000 to $12,000 price range were specified. A listing of community facilities, utilities, and street *117 improvements available was included in the application. Sometime in the spring or early summer of 1954 Fields discussed the availability and possible sale of tract 3996 with Robert P. Bruce, sometimes hereinafter referred to as Bruce, another builder in the San Bernardino area. Bruce, who was constructing inexpensive homes in the area, was interested in tract 3996 for use in his building program since the tract was particularly suited for low-cost housing. Bruce was not interested in the tract, however, unless it were qualified for FHA financing, and discontinued discussion until such time as FHA approval could be acquired by petitioner. It was understood that Fields would proceed to obtain the aproval necessary to ensure FHA financing for the construction of houses on the tract. Petitioner completed its application with FHA. Bruce was the first and only person petitioner talked to about purchasing the land. In a subdivision report dated June 14, 1954, FHA approved a building program of one-family, detached dwellings in the $6,000 price range for the tract. Approval was given under Title 1, section 8 of the National Housing Act. That section permitted concrete floors without covering, *118 an absence of gutters and down spouts, the absence of doors on closets and bedrooms, and the absence of shelving and cabinets with the exception of a sink cabinet. Builders constructing houses under this section were known as builders of cheap housing. Petitioner had never built under Title 1, section 8, and did not wish to enter that kind of a building operation. Soon after Fields received the FHA subdivision report, he notified Bruce that approval had been obtained. Negotiations were resumed for the purpose of discussing the sales price and method of payment. After some negotiation a total price of $72,800, based upon a price of $800 per lot for 91 lots, was agreed upon. Bruce was unable to pay cash for the property. FHA would not approve financing where secondary financing existed. This rule necessitated rejection of any plan of payment involving a trust deed, promissory note, mortgage, or other similar evidence of indebtedness. Petitioner's attorney suggested a method involving the use of preferred stock with sinking fund requirements and restrictions on voting rights of common shares, the plan contemplating formation of a corporation by Bruce. The attorney noted that this method *119 would give petitioner some security for the purchase price and at the same time qualify under FHA rules. The suggestion was accepted. By letter to the California Division of Real Estate, dated September 13, 1954, Gordon Fields forwarded a title report and affidavit executed by him as the petitioner's president, certifying that pursuant to the rules and regulations of the real estate commissioner all moneys accepted from prospective purchasers in tract 3996 would be deposited in a trust fund account in the Citizens Bank in San Bernardino. In a letter to the East San Bernardino Water District, dated September 21, 1954, Fields wrote in regard to tract 3996, saying in part: We are almost to the point of starting construction. Our subdivision is of record now and we hope to have all of these lots built on within the next six months. This letter was written to determine whether the water company would be able to furnish water for tract 3996. On October 4, 1954, a State of California Subdivision Report was issued to petitioner as subdivider. This report was required before the subdivision lots could be listed for sale. A new California corporation under the name of Robert P. Bruce, Inc., *120 hereinafter sometimes referred to as the purchaser, was formed by Bruce for the construction of speculative homes on tract 3996. Articles of incorporation were filed in the office of the Secretary of State of the State of California on October 11, 1954. Article "Fifth" authorized 1,000 preferred and 1,000 common shares with a par value of $100 each. Article "Sixth" provided for certain preferences, privileges, and restrictions on the preferred shares, including provision for a six per cent annual dividend, preferential distribution procedures in the event of dissolution of the corporation, voting rights in case of an arrearage of three quarterly dividend payments, and establishment of a sinking fund out of net profits to purchase or redeem 50 percent of the par value of preferred shares outstanding at the end of each fiscal year. It was provided that if net income for any year were insufficient to meet the 50 percent requirement, then all net income in that year would be set aside and the shortage from 50 percent would be added to the sinking fund requirement for the following year. The tract was to be transferred to the purchaser with no physical improvements made to the property. *121 Bruce sought financing for necessary offsite improvements, as he did not have sufficient cash of his own to pay for necessary curbs, sewers, streets, water facilities, and the like. When he could not obtain financing for the improvements from any third party, Bruce indicated to petitioner that it appeared the deal would fall through. In order to avoid termination of the deal, petitioner agreed to make the necessary improvements at a cost to the purchaser of $400 per lot, or a total of $36,400. Again it was anticipated that preferred stock would be issued. Since the original purchase price of the 91 lots, $72,800, plus the cost of the improvements, $36,400, exceeded the $100,000 par value of the total preferred stock provided for in the articles of incorporation of the purchaser, it was agreed that initially only 83 lots would be transferred to the purchaser. On December 1, 1954, at a special meeting of the board of directors, the proposed sale to Bruce was approved by petitioner in the following resolution: On motion duly made, seconded and unanimously approved, it was resolved that Wilson & Fields would sell to Robert Bruce, Inc. 83 lots, as above described, for a consideration of *122 $800.00 per lot, and that Wilson & Fields would perform improvement work valued at $400.00 per lot, in payment for which Wilson & Fields would receive preferred stock for an amount of $99,600.00 in Robert Bruce, Inc.
The petitioner's minute books, both prior and subsequent to this date, make no other reference to the unimproved 20 acres designated as tract 3996. On the petition of a third party, the area within which tract 3996 was located was reclassified for zoning purposes from A-1 to R-1 on February 11, 1954. This zoning change was adopted by the board of supervisors on September 27, 1954. R-1 zoning permits subdivision for one-family dwellings. By letter dated December 9, 1954, FHA advised Fields that application on tract 3996 would be considered under section 203(i) of the National Housing Act, providing for a maximum loan of $7,000 on houses built thereunder. By written instrument dated December 15, 1954, petitioner, through and by its president, offered to convey lots 2 to 23, inclusive, 26 to 65, inclusive, 70 to 90, inclusive, tract 3996, or a total of 83 lots, to Robert P. Bruce, Inc. The offer was made upon the condition that the purchaser obtain a permit to issue and in *123 fact issue to petitioner the 1,000 shares of preferred stock authorized by its articles of incorporation. The board of directors of Robert P. Bruce, Inc., accepted petitioner's offer and authorized the sale and issuance of 1,000 shares of preferred stock on December 16, 1954. By application dated December 16, 1954, Robert P. Bruce, Inc., requested a permit to issue 1,000 shares of its preferred stock to the petitioner in exchange for the lots in tract 3996. In a writing dated December 28, 1954, between petitioner and Robert P. Bruce, Inc., it was agreed that the 83 lots transferred to the purchaser would be improved by the addition of water, curbs, paving, grating, gutters, and subdivision engineering to comply with county requirements for a consideration of $400 per lot, or a total of $33,200, payable in the preferred stock of Robert P. Bruce, Inc.
A permit authorizing issuance of securities was issued on December 30, 1954. Paragraphs 1 and 2 of this permit authorized the company as follows: 1. To sell * * * to Robert P. Bruce * * * 40 of its common shares, at par, for cash, * * *. 2. To sell and issue to Wilson and Fields, a California corporation, an aggregate of not to exceed 1,000 *124 of its preferred shares, as full and final consideration for the real property described in its application, first to be conveyed to applicant, free and clear of all liens and encumbrances and subject only to taxes not delinquent and conditions, * * * of record. The following terms and conditions were imposed: (a) That none of the securities authorized by paragraphs 1 and 2 hereof shall be sold or issued unless and until the applicant first shall have selected an escrow holder and said escrow holder shall have been first approved in writing by the Commissioner of Corporations; that when issued all documents evidencing any of said securities shall be forthwith deposited with said escrow holder, to be held as an escrow pending the further written order of the said Commissioner; that the receipt of said escrow holder for said documents shall be filed with said Commissioner; and that the owner or persons entitled to said securities shall not consummate a sale or transfer of said securities, or any interest therein, or receive any consideration therefor, until the written consent of said Commissioner shall have been obtained so to do. In due course pursuant to the terms of the prior agreements *125 between the parties and pursuant to the provisions of the Corporations Commissioner's permit dated December 30, 1954, 1,000 shares of $100 par value preferred stock of Robert P. Bruce, Inc., were issued to the petitioner. The shares were placed in escrow with the American National Bank, of San Bernardino. The escrow requirements were placed upon the shares by the Commissioner of Corporations because the value of the real property had not been substantiated, because of certain preferences in connection with the preferred shares and the heavy sinking fund requirements contained in the articles of incorporation. The balance sheet of purchaser as of the time of issuance of the preferred shares appeared as follows: ASSETS
Current assets: Cash
$ 4,000
Investments: Land held for house construction
100,000
Total assets
$104,000
LIABILITIES AND STOCKHOLDERS' EQUITY
Liabilities: None
Stockholders' Equity: Common stock - 40 shares at $100 par value
4,000
Preferred stock - 1,000 shares at $100 par value
100,000
Total stockholders' equity
104,000
Total liabilities and stockholders' equity
$104,000
Petitioner and the purchaser agreed that 83 lots would be conveyed to Robert P. Bruce, Inc., and that all the authorized *126 preferred stock ($100,000 par value) would be issued to petitioner and allocated to these 83 lots ($99,600); that two lots for model homes not requiring FHA financing would be conveyed to Robert P. Bruce, Inc., and that a trust deed would be given to petitioner to secure that part of the total purchase price and site improvements allocated to these two lots ($2,400); and that title to the remaining six lots which were scheduled for development at the end of the project would be retained by petitioner as security until Robert P. Bruce, Inc., was ready to start construction on these lots; at that time title would be conveyed if, but only if, Robert P. Bruce, Inc., had then fully complied under the agreement. By deed dated December 1, 1954, petitioner conveyed title to lots 91 and 92 to the purchaser. These were the model home sites for tract 3996. By deed dated January 13, 1955, petitioner conveyed title to lots 2 to 23, inclusive, 26 to 65, inclusive, and 70 to 90, inclusive, of tract 3996 to Robert P. Bruce, Inc. The purchaser transferred to petitioner 1,000 shares of preferred stock of Robert P. Bruce, Inc. The remaining six lots were held back until the purchaser had performed satisfactorily *127 with respect to the first 85 lots. By deed dated November 1, 1955, petitioner conveyed title to these lots. Robert P. Bruce, Inc., executed a note for $2,400 and a second deed of trust in return for the deeds to the two model home lots. This note was fully paid by the purchaser in 1955 and the trust deed was cancelled. On its return for fiscal 1955 petitioner reported the profit from the sale of the lots in tract 3996 (therein described as "Sterling Ave. Land") as long-term capital gain. The installment method of reporting the gain was elected. A sales price of $71,200 and a cost of $23,740.49 were listed. A gross profit ratio of 66.66 percent on collections of $10,000 was returned. The amount charged for improvements was included under commercial construction income in fiscal 1955, the year the work was completed. Robert P. Bruce, Inc., purchased the lots in tract No. 3996 as sites for a low-cost housing development. When the lots were purchased, preparatory work, such as engineering, was completed, the street profiles were prepared, the tract map and restrictions were filed, FHA approval had been obtained, and numerous applications necessary for the subdivision of real property *128 in the State of California had been filed and approved. The purchaser took advantage of this preliminary activity in developing the tract for sale of houses. Immediately after sale of the lots the name of Robert P. Bruce, Inc., as new owner and builder of tract No. 3996, was substituted for the petitioner in filings and applications pending with the FHA, the State of California, and all other agencies and necessary regulatory bodies. Robert P. Bruce, Inc., built houses in the $6,650 to $7,200 price range on tract No. 3996. All of the 91 lots were built upon and houses sold by late 1956 or early 1957. In accordance with its articles of incorporation Robert P. Bruce, Inc., redeemed its preferred shares and paid dividends thereon on the dates and in the amounts indicated below: Amounts Paid
Preferred
shares
Date
redeemed
Dividends
June 20, 1955
$ 10,000 *
$ 263.33
October 5, 1955
20,000
870.00
January 10, 1956
15,000
867.50
April 18, 1956
20,000
1,500.00
August 20, 1956
10,000
950.00
November 15, 1956
10,000
1,100.00
January 4, 1957
8,000
654.61
February 18, 1957
7,000
572.79
Total
$100,000
$6,778.23
With respect to the so-called dividends, Bruce pointed out to Fields that the total price was increased *129 thereby and objected to this state of affairs. Petitioner agreed that Bruce's objection had merit, and reduced the amount owing by a sum equal to one-half the total dividends paid on the preferred stock. In making final settlement, that part of the total purchase price and site improvements cost allocated to the six lots conveyed by deed dated November 1, 1955, $7,200, was reduced by $400, representing the difference between the preferred stock redeemed, $100,000, and the amount due from the purchaser to petitioner for the 83 lots, $99,600. By applications to and order of the Commissioner of Corporations, shares were released from escrow for cancellation on or about each of the redemption dates. An order terminating the escrow was issued on August 26, 1957. The balance sheet of Robert P. Bruce, Inc., on April 30, 1955, was as follows: Assets
Cash
$ 1,255.61
Land
100,000.00
Work in progress
13,969.29
Organizational expenses
1,046.76
Total assets
$116,271.66
Liabilities and Capital
Construction loans payable
$ 12,271.66
Preferred stock
$100,000
Common stock
4,000
Total capital
104,000.00
Total
$116,271.66
In a letter to a highway commissioner, State of California, dated May 22, 1956, Gordon Fields wrote in *130 part as follows: All of the property in this subdivision, except these two lots, was purchased from Davis and Finney with the understanding that we were to subdivide the property. We did not buy the property that is now Lot 1 and Lot 93, but, for convenience in the trade, this property was deeded to us with the understanding that it would be deeded back to Davis and Finney once it was put into a subdivision. This letter was written in an effort to obtain highway access for lots 1 and 93, the two commercial lots. The term "subdivision," as used by Fields, was intended, in accordance with the custom in the trade, to apply to both rental developments and rental developments for sale. On its return for the fiscal year ended August 31, 1955, as a part of an attached operating expense schedule, petitioner deducted the sum of $9,122.49 opposite a line entitled "Loss on Doubtful Accounts." The sum claimed was not the actual amount of loss realized from uncollectible accounts receivable in fiscal 1955 but was the amount which the accountant whom the petitioner employed to prepare its income tax returns determined could reasonably be added to the reserve for bad debts and claimed as an expense *131 item in this period. The accountant's explanation of why the bad debt schedule on the face of the return was not filled in was that a multiplicity of corporate accounts receivable made the required schedule difficult to complete and, also, because the claimed deduction was subject to audit during the annual examination of the corporation's return. As of the close of business on August 31, 1955, petitioner had accounts and notes receivable of $411,237.99 with gross credit sales on account for this period of $1,611,667.37. Petitioner's bad debt reserve totalled $10,468.88 at the beginning of the fiscal year and $12,312.22 at the end of the period, or a net increase in the reserve in 1955 of $1,843.34. During fiscal 1955 there were charges against the reserve of $7,279.15. Under the accounting system employed since 1946 by petitioner and its predecessor, open account losses were charged to a reserve for bad debts, whereas losses on conditional sales contracts were charged to a special account called "repossession losses." In 1955 petitioner carried approximately 2,000 accounts receivable. The accountant's practice was to schedule each type receivable, e.g., open accounts, installment *132 contracts, etc., and review in detail some of the older and more important accounts with Fields. He also conferred with the head bookkeeper and with an employee who handled some of the account billings. The accountant did not analyze and review each of the 2,000 accounts receivable but used an over-all judgment based upon discussion of 200 or 300 of the accounts with Fields or one of the two other corporate employees. After scheduling the receivables and consulting with the three employees, the accountant determined what in his opinion a reasonable total reserve requirement would be in relation to total receivables and based upon his interpretation of the information obtained from these people concerning the probable collectibility of a portion of the outstanding accounts receivable. At this point the accountant would apply a varying statistical percentage ratio to each type of receivable accounts maintained by the corporation in an effort to arrive at a specific figure for each of the receivables by age group, the aggregate of which would approximate the amount of total reserve the accountant had previously determined to be reasonable and necessary to cover probable losses on all *133 of the accounts receivable outstanding as of the end of the fiscal year. Next, the year end reserve account balance was subtracted from the aggregate sum thus ascertained, which difference was the amount of the current fiscal year's addition to the petitioner's reserve account for bad debts which the accountant included on the return as the loss on doubtful accounts. The accountant did not compile figures on previous years' bad debt loss experience for comparison and use in determining the percentages and amounts to be utilized and set aside for fiscal 1955. The amount of the disallowance of the addition to the reserve for bad debts for fiscal 1955 determined to be excessive in the statutory notice of deficiency was computed from the petitioner's books and records on the basis of a comparison of the petitioner's experience ratio of cumulative bad debt losses to total receivables for the period August 31, 1951, through August 31, 1955, which comparison indicated that the annual addition claimed for fiscal 1955 was excessive by $7,990.11. The gross credit sales on account, receivables outstanding as of the end of the year, debts charged to the reserve for excess of recoveries credited *134 to the reserve, and the ratio of losses to receivables for each of the fiscal years ended August 31, 1951, 1952, 1953, 1954, and 1955 were as follows: Fiscal
Sales
Net
Ratio of
Year Ended
on Account
Receivables
Bad Debts
Losses (%)
8/31/51
$1,212,004.09
$ 185,830.45
$ 539.84
.289
8/31/52
2,072,721.98
278,365.93
3,107.56
1.11
8/31/53
2,663,221.63
340,133.26
4,688.52
1.30
8/31/54
1,460,125.74
302,620.72
347.75
.110
8/31/55
1,611,667.37
411,237.99
7,279.15
1.77
$1,518,188.35
$15,962.82
1.051
Respondent applied a five-step process in arriving at the amount to be properly allocated to the reserve for bad debts for fiscal 1955. He first started with the actual bad debts for the period August 31, 1951, through August 31, 1955, substracting therefrom bad debts recovered to arrive at an aggregate bad debt figure for the period. The second step was to compare the resulting bad debt figure to total receivables for the period to find the aggregate bad debt loss experience ratio. As the third step, the ratio thus ascertained was multiplied by the receivable balance as of August 31, 1955, to determine the bad debt reserve needed for receivables in 1955. Next, the figure obtained in the third step was added to the net bad debts charged *135 to the reserve in 1955 to find the total reserve requirement for this year. The final step was to subtract the reserve balance at the end of the previous year from the total reserve requirement computed in step four to find the difference between these figures, which difference was the amount computed by the agent to be a reasonable addition to the reserve in the year under consideration. The mathematical equation and figures used therein in computing the addition to the reserve for fiscal 1955 were as follows: Step 1
$16,294.93 - $332.11 = $15,962.82
Step 2
$15,962.82 / $1,518,188.35 = 1.051%
Step 3
1.051% X $411,237.99 = $4,322.11
Step 4
$4,322.11 + $7,279.15 = $11,601.26
Step 5
$11,601.26 - $10,468.88 = $1,132.38
The gross credit sales on account, total receivables outstanding at the end of the year, gross bad debts charged against the reserve, the total reserve and the amount added to the reserve in each of the fiscal years ending August 31, 1956 to 1960, inclusive, were as follows: Charged
Sales
Total
Against
Year
Added
Year
on Account
Receivables
Reserve
End Reserve
to Reserve
1956
$3,029,282.97
$488,168.31
$6,142.52
$17,293.01
$11,123.31
1957
819,596.54
496,995.40
587.58
20,452.75
3,727.32
1958
1,601,356.11
430,995.63
5,837.17
14,615.58
1959
586,023.97
204,513.23
2,288.67
12,326.91
1960
480,765.88
182,414.37
4,310.92
8,015.99
*136 Petitioner made sales of furniture on open account and under conditional sales contract. It was customary for the petitioner to write up open accounts receivable as installment contracts as they became 30 to 90 days old. The procedure followed was to credit the receivables account and debit the installment contracts receivable account. It was the petitioner's practice to charge losses on the open accounts to its reserve for bad debts, whereas losses on conditional sales contracts were charged to a special account entitled "repossession losses," which account was a separate part of the petitioner's books and records and listed as a separate deduction on its tax returns. Whenever an installment contract became uncollectible, an attempt would be made to repossess the furniture. The amount of loss resulting from a repossession was computed by measuring the difference between the value of the merchandise taken back and the value of the uncollectible installment contract receivable. The installment contract receivable would be written off by a debit to the merchandise inventory asset account and a credit to the repossession loss account of the amount necessary to balance the receivable. *137 Petitioner's books and records reflect repossession losses on conditional sales contracts for the fiscal years and in the amounts indicated below: Fiscal Year
Repossession
Ended
Loss
8/31/51
$2,286.45
8/31/52
2,882.27
8/31/53
549.28
8/31/54
176.17
8/31/55
3,735.09 *
8/31/56
148.22
8/31/57
2,499.14
8/31/58
3,199.80
8/31/59
8/31/60
On page 2 of the income statement attached to petitioner's corporate tax return for the fiscal year ended August 31, 1955, petitioner deducted $3,735.09 as repossession loss on uncollectible installment contract receivables. Losses on repossession were not taken into account in respondent's computation of the amount allowable as a reasonable addition to the petitioner's reserve for bad debts in fiscal 1955. Opinion In 1953, petitioner, a corporation, purchased 20 acres of undeveloped land in San Bernardino County, California. In 1954 petitioner sold the property to Robert P. Bruce, Inc. The first issue is whether petitioner realized capital gains or ordinary income on the sale. Its resolution depends upon whether the property was held by petitioner primarily for sale to customers in the ordinary course of its trade or business. [1] *138 This is a question of fact to be disposed of through application of the following tests: The frequency and continuity of sales; the extent of development and improvement of the property; and the sales methods employed. W. T. Thrift, Sr., 15 T.C. 366; Boomhower v. United States, 74 F. Supp. 997 (N.D. Iowa, 1947). Petitioner's intentions in acquiring the property, while not conclusive as to the purpose for which the property was "held" at the time of sale, Richards v. Commissioner, 81 F. 2d 369 (C.A. 9, 1936), affirming 30 B.T.A. 1131, also constitute a relevant consideration. *139 The property is located near a California insane asylum. The asylum employed 400 to 500 persons in 1953, but a substantial increase in personnel was in prospect. Petitioner's president, Gordon Fields, testified that the land was purchased in anticipation of the hospital's expansion. Asylum employees constituted a low-income group, who had experienced difficulty in obtaining housing. Petitioner intended to construct multiple-family dwellings on the property for rental to hospital employees. Fields testified that construction of homes for sale to hospital workers also was considered. Purchase of the property was reflected in petitioner's books by an entry showing land acquired for investment. About the time petitioner bought the land, Fields contacted Santa Fe Federal Savings and Loan Association in an attempt to secure financing for the rental project. Santa Fe had financed petitioner's only other rental development. The vacancy factor in the earlier project was about 50 percent, however, and while no formal loan application was made, petitioner ascertained that the lending institution would not finance the rental project proposed. Petitioner made no other attempts to secure financing. *140 Instead, all ideas for development of the tract were abandoned, and petitioner decided to dispose of the property as a single unit. Apparently the property was valuable only for low-cost housing development. Petitioner did not proceed with the construction and sale of low-cost units because Fields wished to establish and maintain a reputation as a builder of quality homes. The evidence of petitioner's intention not to subdivide the property, construct low-cost houses, and sell the developed lots is convincing. The aforementioned facts indicate that the property was acquired primarily for development of a rental complex and initially held for that purpose. The courts have recognized that a taxpayer may hold some property for sale in the ordinary course of a trade or business and at the same time hold other property for investment. Eline Realty Co., 35 T.C. 1. Proper analysis, while taking cognizance of all of petitioner's activities, resolves the issue with primary attention to the particular parcel involved. See, e.g., Charles E. Reithmeyer, 26 T.C. 804. Thus, the facts that petitioner had, with respect to other property, engaged in subdivision and sale of lots and the construction *141 of homes for sale in the ordinary course of business are neither dispositive of the issue before us nor presumptive evidence of the principal purpose for which this land was held. We are of a similar mind with respect to Gordon Fields' background as a real estate broker and contractor. The record does disclose that the petitioner filed a subdivision map covering the subject property in April 1953; filed a declaration of restrictions on the tract in May, 1953; filed a notice of intention to subdivide, improve and sell separate parcels in June, 1953; and filed an application for subdivision analysis with the Federal Housing Administration in April 1954. Petitioner asserts that all these steps were necessary to place the property in marketable condition. It is not clear from the record whether the initial negotiations with Robert Bruce for sale of the property to him took place before or after the application for FHA analysis of the property; but resolution of this matter appears of little moment, since Bruce discontinued discussion of the sale until FHA approval was forthcoming in June 1954. In short, we are satisfied that sale of this property, suitable only for low-cost housing or *142 pasture, was dependent upon FHA, California Division of Real Estate, and local flood control approval, and that seeking such approval was consistent with an intention to dispose of the property in a single transaction. That these were prerequisites to sale is substantiated by the actual demands made by Bruce. We view in the same light statements made to various governmental agencies wherein petitioner indicated that the property was to be subdivided for sale on a lot-by-lot basis. Apparently petitioner sought authorization which could be passed along to the purchaser. This kind of activity is different in direction and intent from that which is part and parcel of sale to customers in the ordinary course of a trade or business. Cf. W. T. Thrift, Sr., supra. In Thrift, capital gains treatment was held warranted where the activity of the taxpayer was merely incident to disposal of the property in what was essentially a single transaction. This distinction was well put by the Court of Appeals in Galena Oaks Corporation v. Scofield, 218 F. 2d 217, 220 (C.A. 5, 1954), affirming 116 F. Supp. 333 (S.D.Texas, 1953), where a contrary result was reached: Congress intended to alleviate the *143 burden on a taxpayer whose property has increased in value over a long period of time. When, however, such a taxpayer endeavors still further to increase his profits by engaging in a business separable from his investment, it is not unfair that his gain should be taxed as ordinary income. Nothing in the record before us indicates that petitioner took any step susceptible of the interpretation that it was thereby engaging in a business separable from its investment. On the contrary, examination of petitioner's activities incident to sale of the property discloses that petitioner did not list the property for sale; never employed a broker or salesman to sell lots; never posted signs on the property listing lots for sale; and in no way improved the property physically. Petitioner did make off-site improvements, but this activity was the result of a separate agreement between petitioner and the purchaser, the proceeds of which were reported as ordinary income by petitioner. For all of the above reasons, we are satisfied that the property here in question was not held for sale to customers in the ordinary course of a trade or business, and that petitioner is entitled to capital gains treatment *144 on the proceeds therefrom. The second issue is whether petitioner is entitled to report the proceeds from the sale on the installment basis. The issue is limited to the question whether payments in the year of sale (exclusive of evidences of indebtedness of the purchaser) exceeded 30 percent of the selling price. [2] *145 The selling price of the lots was $71,200. [3] During the fiscal year 1955, petitioner received $10,000 in cash. Thus, the determinative question is whether receipt of preferred stock, unredeemed in the face amount of $61,200 in fiscal 1955, takes the transaction outside the installment provisions of section 453. It is respondent's position that the preferred stock did not constitute evidence of indebtedness of the puchaser, and that the money received, plus the fair market value of the unredeemed preferred stock, was in excess of 30 percent of the selling price. For reasons which will hereinafter become apparent, we have found it unnecessary to determine the fair market value of the preferred stock at the time of receipt in 1955. Petitioner asserts that the stock was not given in payment for the property but was given merely as security for the *146 remainder of the purchase price. At the time petitioner's president and Robert Bruce first discussed sale of the property, Bruce indicated he would not be interested in buying the property unless it could qualify for FHA loans for low-cost housing. Thereafter, appropriate FHA approval was obtained. FHA regulations prohibited the existence of secondary financing, however, and Bruce did not have sufficient funds to purchase the property outright. Petitioner wanted an arrangement with Bruce which would give it some measure of security for the purchase price. Because of the FHA requirements, neither a note nor any form of mortgage could be given by the purchaser. Petitioner's attorney suggested that Bruce form a corporation; that the corporation be authorized to issue preferred stock; that the property be deeded to the corporation; and that preferred stock be taken back by petitioner. He advised that such a method would afford some degree of safety for petitioner. Actually, when petitioner separately agreed to make improvements on the property for a price of $36,400, the total cost of the property plus improvements for which preferred stock was to be issued exceeded the $100,000 in preferred *147 stock authorized to Robert P. Bruce, Inc., in its articles of incorporation. Thus, other security measures were necessary, and certain lots were retained by petitioner pending performance on the lots transferred. Bruce created a corporation. The articles of incorporation provided that a sinking fund would be created for redemption of the preferred shares; that arrearages of three quarterly dividend payments on the preferred stock would result in voting rights passing to the preferred shareholders; and that all net profits would be devoted to the sinking fund for redemption of preferred shares unless net profits were sufficient in the year following purchase to make up a sinking fund equal to 50 percent of the face value of the preferred shares outstanding and a similar percentage in the second year after the purchase. In short, the purchaser was bound to redeem the preferred stock or to provide for the redemption thereof through what the petitioner has rightly described as "drastic sinking fund requirements." A similar question has arisen in numerous cases, involving the deductibility, as interest, of payments made by a corporation on certain certificates formally designated as preferred *148 stock. In United States v. Title Guarantee & Trust Co., 133 F. 2d 990, at 993, the Sixth Circuit Court of Appeals stated the general rule, in such cases, as follows: In the determination of the question before us, the cases agree that the decisive factor is not what the payments are called, but what in fact they are; and that if taken as a whole, the evidence shows a relation of debtor and creditor, the payments made on account of that relation, will be interest, no matter how called, while if taken as a whole, the evidence shows a stockholding relation, the payments made will be dividends, equally no matter how called. Commissioner of Internal Revenue v. J. N. Bray Co., 5 Cir., 126 F. 2d 612; United States v. South Georgia Ry. Co., 5 Cir., 107 F. 2d 3. In each case it must be determined whether the real transaction was that of an investment in the corporation or a loan to it. On this point, the designation of the instrument issued by the corporation, while not to be ignored, is not conclusive. The real intention of the parties is to be sought and, in order to establish it, evidence aliunde the contract is admissible. If the evidence establishes that the dividends paid are, according *149 to the intent of the parties, in fact, interest, and the stock, on which the dividends are paid, is merely held by the creditor as security, it makes no difference what the reason was for paying it in that form [Commissioner of Internal Revenue v. Proctor Shop, Inc., 9 Cir., 82 F. 2d 792]; and one who executes an instrument which does not correctly describe the relation of the parties, may, as against the government, disclose the true relationship of debtor and creditor; and sums paid as interest, regardless of the name by which they are called, may be deducted by the taxpayer from its income. Arthur R. Jones Syndicate v. Commissioner of Internal Revenue, 7 Cir., 23 F. 2d 833. Payment of interest, in the form of dividends, does not change its character when it is shown that the reason for taking that form was for some reason personal to the parties concerned. Wiggin Terminals, Inc. v. United States, 1 Cir., 36 F. 2d 893, 898. The essential difference between a stockholder and a creditor is that the stockholder's intention is to embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he may enjoy the chances of profit. The creditor, on the other *150 hand, does not intend to take such risks so far as they may be avoided, but merely to lend his capital to others who do intend to take them. Helvering v. Richmond F. & P. R. Co., 4 Cir., 90 F. 2d 971. See Warren v. King, 108 U.S. 389, 399, * * *. See also Commissioner v. O.P.P. Holding Corp., 76 F. 2d 11 (C.A. 2d), affirming 30 B.T.A. 337; Palmer, Stacy-Merrill, Inc., v. Commissioner, 111 F. 2d 809 (C.A. 9), affirming 39 B.T.A. 636; Commissioner v. Meridian & Thirteenth R. Co., 132 F. 2d 182 (C.A. 7), reversing for other reasons 44 B.T.A. 865, and the numerous decisions cited in footnote 4 of the latter case. These cases furnish a helpful analogy here. The evidence satisfies us that it was the intention of petitioner merely to receive security for the amount outstanding on the purchase price of the property involved, and that preferred stock was employed only because of FHA regulations. Because of FHA requirements, no notes were taken back by petitioner, and petitioner offered to sell and the purchaser accepted that offer in return for the issuance to petitioner of preferred stock. Thus, the agreement on its face indicates a sale of real property in exchange for preferred *151 stock. If we were unable to look behind the face of this contract, we would have to value the stock received, adding it to the $10,000 in cash received upon the redemption of ten shares of stock, to determine whether an amount in excess of 30 percent of the purchase price was received in fiscal 1955. We are satisfied, however, that the true intention of the parties that the preferred stock was to be merely security for the amount outstanding on the price is controlling. The following quotation from Consolidated Dry Goods Company v. United States, 180 F. Supp. 878, 881 (D.C.Mass., 1960), is appropriate: In construing the meaning of a statutory provision the purpose underlying the providion should also be taken into consideration. "The method of reporting income on the installment basis was enacted by Congress as a relief provision. The chief idea which motivated Congress in allowing the installment method of reporting income was to enable a merchant to actually realize the profit arising out of each installment before the tax was paid. In other words, the tax could be paid from the proceeds collected rather than be advanced by the taxpayer." Thomas F. Prendergast, Executor, 22 B.T.A. 1259. *152 * * * Since the preferred stock herein was employed only because of FHA requirements and since it was used in place of a note which the petitioner would otherwise have insisted upon, neither the wording nor the sense of section 453 is violated by a conclusion that the preferred stock in fact constituted evidence of indebtedness of the purchaser. The parties clearly contemplated, and in fact their intentions are demonstrated by their performances, that the purchase price would quickly be paid through stock redemptions by the purchaser after construction of the homes under FHA financing. By 1957 the entire purchase price had been paid. This seems to us clearly in accord with the intention of Congress in enacting section 453. This conclusion is not vitiated by the nature of the preferred stock itself, or the circumstances surrounding its issuance. While we have found it unnecessary to ascertain the fair market value of the preferred stock when it was issued in fiscal 1955, it is not without significance that the Commissioner of Corporations insisted that the preferred stock be placed in escrow and that its sale by petitioner be dependent upon the consent of the Commissioner of Corporations. *153 The escrow requirements were placed on the stock by the Commissioner of Corporations because the value of the real property had not been substantiated, because of certain preferences in connection with the preferred shares and the heavy sinking fund requirements contained in the articles of incorporation. Any market for the stock would clearly have been limited. Thus, the stock fell short of being the equivalent of cash. It may be noted, too, that where an escrow stands in the way of receipt by a vendor of his sale price, he is not taxed as though he had received the price directly. Cf. Rebecca J. Murray, 28 B.T.A. 624; Preston R. Bassett, 33 B.T.A. 182, affd. 90 F. 2d 1004 (C.A. 2, 1937); Gibbs & Hudson, Inc., 35 B.T.A. 205. While there was nothing further to be done by petitioner to entitle it to payment, the parties clearly contemplated that payment would be delayed beyond fiscal 1955, and the escrow imposed by the Commissioner of Corporations enforced this delay. For all of these reasons we are satisfied that petitioner is entitled to report the proceeds of the sale upon the installment method. The third issue involves the reasonableness of additions to the reserve for bad *154 debts made by petitioner for the fiscal year 1955. [4] Petitioner claimed a deduction of $9,122.49 as a reasonable addition. Respondent disallowed all but $1,132.38 of this amount as excessive. Petitioner computed the amount to be added to the reserve as follows: Petitioner's *155 accountant examined 10 to 15 percent of the outstanding accounts receivable. Based on the judgment of the accountant, petitioner's president, and petitioner's bookkeeper, the accounts were classified in terms of collectibility. For each category of accounts, classified by age, a bad-debt factor was postulated. These factors were then applied to total accounts receivable to determine the amount to be added to the reserve. This method did not include reference to petitioner's bad-debt experience in prior years. The reserve was used solely for sales on "open account." Conditional sales were treated separately. No reserve was created therefor. Instead, petitioner took a deduction for repossession losses with respect thereto. Therefore, conditional-sales contracts were not considered in computing the amount to be added to the reserve in 1955. Petitioner argues that its addition to the reserve for 1955 was reasonable and asserts further that the addition should be approved because it had been in use over a period of several years. One of the appropriate methods of analysis of an addition to a reserve in a particular year is a comparison of the estimate with actual bad-debt experience in *156 subsequent years. Platt Trailer Co., 23 T.C. 1065; Mill Factors Corporation, 14 T.C. 1366. Such analysis discloses that the 1955 addition was greater than the amount actually required. In fact, by 1958 petitioner ceased, for at least three years, making additions. Petitioner admittedly did not base the 1955 addition upon analysis of experience in prior years. Moreover, no evidence before us indicates the necessity for the amount of the addition made in 1955. Petitioner's use of a given method over a period of several years does not establish its reasonableness for the year in issue. As was stated in Black Motor Co., 41 B.T.A. 300, 304: [5]
A method or formula that produces a reasonable addition to a bad debt reserve in one year, or a series of years, may be entirely out of tune with the circumstances of the year involved. * * * Accord T. O. McCamant, 32 T.C. 824. For all of these reasons, petitioner has failed to meet its burden of establishing the reasonableness of its addition for 1955. Respondent's method has been detailed in the findings of fact. Briefly stated, respondent analyzed all outstanding accounts receivable *157 for the five-year period ending with 1955. Actual bad debts were divided by the total of accounts receivable outstanding at the end of each fiscal year. The factor thus computed was used to determine the amount to be added to the reserve in fiscal 1955. This method is not unlike that used by respondent in Black Motor Co., supra, and approved by this Court. A similar analysis was utilized in T. O. McCamant, supra.Cf. Paramount Liquor Co. v. Commissioner, 242 F. 2d 249 (C.A. 8, 1957), affirming a Memorandum Opinion of this Court. Section 166(c), I.R.C. of 1954, allows a deduction for a reasonable addition to a reserve for bad debts within the discretion of respondent. Respondent has wide latitude in the exercise of this discretion, Union National Bank & Trust Co. of Elgin, 26 T.C. 537, but it is clear that his determination in this matter must be based upon a logical and careful examination of all of the factors involved. As we have pointed out, respondent arrived at a factor reflecting the ratio of actual losses to accounts receivable over a five-year period. In computing the factor, however, respondent compared all accounts receivable with losses on open-account sales only. *158 The factor was then utilized for 1955, the year in issue, by applying it to all accounts receivable. Petitioner attacks this method as mathematically illogical. Respondent concedes that it would have been reasonable for him to have derived the factor by comparing only open-accounts receivable with actual losses thereon and then to have applied that factor to openaccounts receivable for the year in issue. Such a method would not only be reasonable but would be a proper determination by respondent. Accounts receivable on conditional sales for which no reserve had been created, which were treated separately and which treatment is not at issue herein, should play no part in computation of a factor to be applied in arriving at a reserve for open accounts. We find no reason for inclusion of conditional-sales receivables in the computations; there is sound logic for their exclusion. A recomputation should be made utilizing a factor based upon a comparison of actual open-account losses with open-account receivables over a period of at least five years. Decision will be entered under Rule 50. Footnotes
*. Year at issue.↩
*. Year at issue.↩
1. Internal Revenue Code of 1954: SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS. * * *
(b) Definition of Property Used in the Trade or Business - For purposes of this section - (1) General Rule. - The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not - * * *
(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *↩
2. Internal Revenue Code of 1954: SEC. 453. INSTALLMENT METHOD. (a) Dealers in Personal Property. - Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price. (b) Sales of Realty and Casual Sales of Personalty. - (1) General Rule. - Income from - (A) a sale or other disposition of real property, or * * *
(2) Limitation. - Paragraph (1) shall apply - (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after [August 16, 1954] the date of enactment of this title), only if in the taxable year of the sale or other disposition - * * *
(ii) the payments (exclusive of evidences of indebtedness of the purchaser do not exceed 30 percent of the selling price. ↩
3. The total price was $72,800 for 91 lots. Two lots are not included in the reported figure since the two model home lots are treated separately.↩
4. Internal Revenue Code of 1954: SEC. 166. BAD DEBTS. * * *
(c) Reserve for Bad Debts. - In lieu of any deduction under subsection(a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts. Income Tax Regs.: § 1.166-4 Reserve for bad debts. * * *
(b) Reasonableness of addition to reserve - (1) Relevant factors. What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve.↩
5. Affd. [42-1 USTC [*] 9265] 125 F. 2d 977↩ (C.A. 6, 1942).